

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

FILED
JUN 16 2021
Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 3:21-CR-__77__ |
| v. | ) | Judge: __Crytzer/Guyton__ |
| IAN P. CLARKE | ) | |
| | ) | |

## INDICTMENT

The Grand Jury in and for the Eastern District of Tennessee, sitting in Knoxville, charges:

### GENERAL ALLEGATIONS

#### Introduction and Background

1. From in or around July 2018 to in or around May 2019, the defendant IAN P. CLARKE, together with Earl Pratt and Vincent Harris (both of whom are named defendants in separate charging instruments), and other persons and entities known and unknown to the grand jury but not charged herein, knowingly and willfully combined, conspired, and agreed to pay and receive kickbacks for the purpose of executing a scheme and artifice to defraud Medicare, a health care benefit program, and to obtain by means of false and fraudulent pretenses, representations, and promises, money under the control of Medicare, in connection with the delivery of and payment for health care benefits, items, or services, and, in furtherance thereof, submitted or caused to be submitted fraudulent claims for payment.

#### Defendant and Related Entities

2. At all times relevant to this indictment, IAN P. CLARKE, resided in the Eastern District of Tennessee and was responsible for the day-to-day operations of TN Premier Care, LLC ("TN Premier Care"). CLARKE caused TN Premier Care to take all action described in this indictment.

3. TN Premier Care LLC was a Tennessee registered business entity doing business in the Eastern District of Tennessee and elsewhere. TN Premier Care was located at 3609 Outdoor Sportsman Pl, Suite 7, Kodak, Tennessee, 37764. TN Premier Care maintained two Medicare National Provider Identifiers ("NPI"): one for its primary care and pain center, NPI 1487081758; and one for its Durable Medical Equipment ("DME") business, NPI 1144719808.

4. Earl Pratt ("Pratt") was a resident of Florida. Pratt owned and operated Florida Primary Sourcing LLC ("Florida Primary Sourcing"), a Florida registered business entity doing business in Boca Raton, Florida, and elsewhere. Pratt has been charged with, and has pleaded guilty to, conspiracy to pay and receive kickbacks, in violation of 18 U.S.C. § 371, in the United States District Court for the Eastern District of Tennessee.

5. Vincent Harris ("Harris") was a resident of Florida. Harris owned and operated Smart Support Professionals LLC ("Smart Support Professionals"), a North Dakota registered business entity doing business in Boca Raton, Florida, and elsewhere. Harris has been charged with, and has pleaded guilty to, conspiracy to pay and receive kickbacks, in violation of 18 U.S.C. § 371, in the United States District Court for the Eastern of Tennessee.

6. Company A was a billing company that submitted claims for reimbursement to Medicare.

7. Unindicted Co-Conspirator 1 was the owner and primary operator of Company A.

### The Medicare Program

8. Medicare was a federal health care program providing benefits to persons who were at least 65 years old or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries." Medicare was divided into multiple parts: Part A covered hospital inpatient

2

care; Part B covered physicians' services and outpatient care, including an individual's access to DME; Part C was Medicare Advantage plans; and Part D covered prescription drugs.

9. Physicians, clinics, and other health care providers, including DME companies, that provided services to Medicare beneficiaries were able to apply for and obtain a Medicare "provider number." A health care provider that received a Medicare provider number was able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

10. A Medicare claim was required to contain certain important information, including: (a) the Medicare beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or NPI. The claim form could be submitted in hard copy or electronically.

11. Enrolled Medicare providers agreed to abide by Medicare's policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers were required to abide by all Medicare-related laws and regulations, including the Anti-Kickback Statute (42 U.S.C. § 1320a–7b(b)(2)), which proscribed the offering, payment, solicitation, or receipt of any remuneration to induce the referral of a patient or the purchase, lease, order, or arrangement therefor, of any good, facility, service, or item for which payment may be made by a federal health care program. Providers were given access to Medicare manuals and services bulletins describing billing procedures, rules, and regulations.

3

12. Medicare only paid for services that were medically necessary and reasonable, and which were actually provided as represented. Medicare did not pay claims for beneficiaries, items, or services that were procured based on the payment or receipt of kickbacks and bribes.

13. Medicare was a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f), and a "health care benefit program" as defined in 18 U.S.C. § 24(b).

14. Medicare Part B covered certain DME, such as Off-The-Shelf ("OTS") knee braces, back braces, shoulder braces, and wrist braces (collectively, "braces"). OTS braces required minimal self-adjustment for appropriate use and did not require expertise in trimming, bending, molding, assembling, or customizing to fit to the individual.

15. The Medicare Benefit Policy Manual (Publication 100-2), Chapter 15, Section 130, provides the longstanding definition of OTS braces: "rigid or semi-rigid devices which are used for the purpose of supporting a weak or deformed body member or restricting or eliminating motion in a diseased or injured part of the body."

16. A claim for DME submitted to Medicare qualified for reimbursement only if it was medically necessary to the treatment of the beneficiary's illness or injury and prescribed by the beneficiary's physician.

17. CMS contracted with various companies to receive, adjudicate, process, and pay Medicare Part B claims, including claims for braces. CMS also contracted with the Unified Program Integrity Contractor ("UPIC") which are contractors that investigate fraud, waste, and abuse. As part of an investigation, UPIC may conduct a clinical review of medical records to ensure that payment is made only for services that meet all Medicare coverage and medical necessity requirements.

18. Medicare regulations required health care providers enrolled with Medicare to maintain complete and accurate patient medical records reflecting the medical assessment and

4

Case 3:21-cr-00077-KAC-JEM   Document 3   Filed 06/16/21   Page 4 of 16   PageID #: 6

diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician. Medicare requires complete and accurate patient medical records so that Medicare may verify that the services were provided as described on the claim form. These records were required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the health care provider

## COUNT ONE
### Conspiracy to Commit Health Care Fraud
### (18 U.S.C. § 1349)

19. Paragraphs 1 through 18 are incorporated herein by reference and re-alleged as though fully set forth in this count.

20. Beginning in or around July 2018 and continuing until in or about May 2019, in the Eastern District of Tennessee and elsewhere, defendant IAN P. CLARKE, Earl Pratt, Vincent Harris, and other persons and entities known to the grand jury, knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree with each other to execute and attempt to execute a scheme and artifice to defraud Medicare, a health care benefit program, and to obtain, by means of false and fraudulent pretenses, representations, and promises, any of the money and property owned by, or under the custody or control of, Medicare, in connection with the delivery of or payment for health care benefits, items, or services, in violation of 18 U.S.C. § 1347.

### Object of the Conspiracy

21. The object of the conspiracy was for IAN P. CLARKE, Pratt, Harris, and other persons and entities known to the grand jury, to defraud, and to obtain money from Medicare by

submitting to Medicare fraudulent claims for reimbursement for durable medical equipment that was not medically necessary.

**Manner and Means of the Conspiracy**

The manner and means by which IAN CLARKE and his co-conspirators sought to accomplish the purpose of the conspiracy included, among other things, the following:

<u>Acquiring and Selling Completed Brace Orders</u>

22. CLARKE, Pratt, Harris, and other persons and entities known to the grand jury agreed on an operating plan to accomplish the purpose of the conspiracy, which they implemented in the following way: (i) Harris acquired completed brace orders by purchasing a "lead"—that is, a recorded call between a call-center employee and a Medicare beneficiary—and then arranging for a licensed medical professional to sign an order for a brace based on the recorded call; (ii) CLARKE, through TN Premier Care, paid kickbacks to Pratt, through Florida Primary Sourcing; (iii) once Pratt received the kickbacks from CLARKE, Pratt transferred the kickbacks to Harris; (iv) Harris then uploaded an electronic copy of the completed brace orders to a shared cloud-based storage system to which CLARKE, Pratt, Harris, and Unindicted Co-Conspirator 1 had access; (v) CLARKE, through TN Premier Care, then submitted, or caused to be submitted, the completed brace order to Medicare for reimbursement.

23. Oftentimes Company A, which specialized in submitting claims to Medicare for reimbursement, and purported to conduct back-end customer service operations, accessed the shared cloud-based storage system and submitted the completed brace orders to Medicare on TN Premier Care's behalf. The reimbursement was paid to TN Premier Care.

24. Pratt received a kickback depending on the particular brace that was listed in the completed brace order. For example, Pratt received $25 for a neck brace and $15 for a back

6

Case 3:21-cr-00077-KAC-JEM   Document 3   Filed 06/16/21   Page 6 of 16   PageID #: 8

brace. During the conspiracy, Pratt received approximately 10% of the kickbacks that he received from CLARKE.

25. The doctors who signed the completed brace orders purchased by CLARKE often did so regardless of medical necessity, in the absence of a pre-existing doctor-patient relationship, without a physical examination, and sometimes based solely on a short telephone conversation.

## Concealment of the Scheme

26. To conceal the scheme, CLARKE, Pratt, Harris, and Unindicted Co-Conspirator 1 created sham contracts and documentation to disguise the acquisition of completed brace orders as legitimate payments for marketing and consulting services.

27. For example, a Consulting Agreement between Florida Primary Sourcing and TN Premier Care, executed by CLARKE and Pratt, required Florida Primary Care to "develop[] future and current patient services and marketing . . . via telephone or other forms of remote correspondence." TN Premier Care agreed to compensate Florida Primary Sourcing on a monthly basis to "reflect[] the potential of ideas and opportunities employed." In fact, Florida Primary Sourcing did not provide any marketing or consulting services to TN Premier Care.

28. To conceal the unlawful kickbacks and bribes, CLARKE opened a separate bank account under the name of TN Premier Care for the purposes of paying kickbacks and bribes to Florida Primary Sourcing in return for completed brace orders.

29. CLARKE submitted a separate enrollment application to Medicare on behalf of TN Premier Care its DME business, which allowed TN Premier Care to submit claims for reimbursement that were separate and apart from the claims it submitted for its primary-care business.

30. In its application for Medicare enrollment, CLARKE certified that TN Premier Care would comply with all Medicare rules and regulations, including that he and TN Premier Care would not violate the Anti-Kickback Statute.

**Overt Acts**

In furtherance of the conspiracy, and to accomplish its unlawful object and purpose, the following overt acts, among others, were committed by CLARKE, Pratt, Harris, and other persons and entities known to the grand jury, in the Eastern District of Tennessee and elsewhere:

31. In or around May 2018, CLARKE, on behalf of TN Premier Care, opened a checking account at Fifth Third Bank (Acct. No. X5997), the purpose of which was to conduct financial transactions in furtherance of the unlawful DME scheme. CLARKE was the only name on the signature account's card.

32. On or about August 7, 2018, CLARKE, through TN Premier Care, transferred $4,500 to Pratt in return for completed brace orders.

33. On or about August 13, 2018, IAN CLARKE, through TN Premier Care, transferred $7,100 to Pratt in return for completed brace orders.

34. On or about August 20, 2018, IAN CLARKE, through TN Premier Care, transferred $7,000 to Pratt in return for completed brace orders.

35. On August 22, 2018, TN Premier Care received Medicare reimbursement checks from CMS in the amount of $1,542.23 and $2,555.41.

36. On August 24, 2018, TN Premier Care received a Medicare reimbursement check from CMS in the amount of $2,027.28

37. On or about September 5, 2018, IAN CLARKE, through TN Premier Care, transferred $10,000 to Pratt in return for completed brace orders.

38. On September 20, 2018, CLARKE emailed an employee with Company A, Harris, and Unindicted Co-Conspirator 1, stating, "I just uploaded more EOB [Explanation of Benefits Forms] and checks to the Shared Dropbox."

39. On or about September 25, 2018, CLARKE emailed Unindicted Co-Conspirator 1 and Pratt to inform them that a beneficiary who had received a DME orthotic had contacted TN Premier Care to complain. CLARKE wrote that the beneficiary had told TN Premier Care that, "he did not order a back-support brace. His comment was 'this is a fraud.'"

40. On October 18, 2018, CLARKE emailed Unindicted Co-Conspirator 1 and Pratt, stating, "Attached are correspondence from payors regarding pay backs and audits. Please review. This information is also in the Dropbox folder."

41. On October 22, 2018, CLARKE, through TN Premier Care, transferred $15,000 to Pratt in return for completed brace orders.

42. On October 30, 2018, CLARKE, through TN Premier Care, transferred $15,000 to Pratt in return for completed brace orders.

43. On November 6, 2018, CLARKE, through TN Premier Care, transferred $15,000 to Pratt in return for completed brace orders.

44. On or about November 13, 2018, CLARKE, through TN Premier Care, transferred $20,000 to Pratt in return for completed brace orders.

45. On or about December 3, 2018, CLARKE, through TN Premier Care, transferred $25,000 to Pratt in return for completed brace orders.

46. On or about December 11, 2018, CLARKE, through TN Premier Care, transferred $15,000 to Pratt in return for completed brace orders.

47. On or about December 26, 2018, CLARKE through TN Premier Care, transferred $15,000 to Pratt in return for completed brace orders.

48. On or about March 20, 2019, CLARKE, through TN Premier Care, transferred $25,000 to Pratt in return for completed brace orders.

49. In or around April 2019, after federal agents conducted a national operation targeting fraud and kickbacks related to DME and other braces, which garnered national media coverage, CLARKE requested that Pratt execute a Consulting Agreement stating that Florida Primary Sourcing would be compensated for "developing future and current patient services and marketing . . . via telephone or other forms of remote correspondence" for TN Premier Care, and that TN Premier Care would compensate Florida Primary Sourcing on a monthly basis to "reflect[] the potential of ideas and opportunities employed."

50. On or about April 19, 2019, at CLARKE's request, Pratt electronically signed the Consulting Agreement on behalf of Florida Primary Sourcing.

51. On or about April 19, 2019, to conceal the DME fraud scheme, CLARKE backdated the Consulting Agreement to September 1, 2018.

52. In or around April 2019, CLARKE told Pratt the Consulting Agreement would reflect their past and future business dealings. In fact, the Agreement did not change or alter their business dealings, which consisted solely of CLARKE transferring kickbacks to Pratt, and Pratt acquiring completed DME orders from Harris, which CLARKE then submitted, or caused to be submitted, to Medicare for reimbursement.

53. On or about May 15, 2019, CLARKE, through TN Premier Care, transferred $34,000 to Pratt in return for completed brace orders.

54. From in or about July 2018 to in or about May 2019, CLARKE paid unlawful kickbacks of approximately $287,600 to Pratt for completed brace orders.

55. From in or about July 2018 to in or about May 2019, CLARKE submitted and caused to be submitted, through TN Premier Care, $778,429 in claims for reimbursement to Medicare for completed brace orders, for which Medicare paid to TN Premier Care $411,963.

All in violation of Title 18, United States Code, Section 1349.

## COUNTS TWO THROUGH TWENTY-THREE
### Payment of Kickbacks in Connection with a Federal Health Care Program
### (42 U.S.C. § 1320a-7b(b)(2)(B))

56. The allegations in paragraphs 1 through 55 this indictment are re-alleged and incorporated by reference as though fully set forth herein.

57. On or about the dates set forth below, in the Eastern District of Tennessee and elsewhere, the defendant, IAN P. CLARKE, did knowingly and willfully offer to pay, and pay, remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, to a person; that is, to Earl Pratt, to induce Pratt to order or arrange for or recommend ordering any good, service, or item for which payment may be made in whole or in part under a Federal health care program, that is, Medicare:

| Count | Approximate Date | Amount of Kickback | Method of Kickback |
|---|---|---|---|
| 2 | August 7, 2018 | $4,500 | Wire transfer from Fifth Third Acct. No. X5997 to Chase Acct. No. X0630 |
| 3 | August 13, 2018 | $7,100 | Wire transfer from Fifth Third Acct. No. X5997 to Chase Acct. No. X0630 |
| 4 | August 20, 2018 | $7,000 | Wire transfer from Fifth Third Acct. No. X5997 to Chase Acct. No. X0630 |
| 5 | September 5, 2018 | $10,000 | Wire transfer from Fifth Third Acct. No. X5997 to Chase Acct. No. X0630 |

11

| 6 | September 19, 2018 | $10,000 | Wire transfer from Fifth Third Acct. No. X5997 to Chase Acct. No. X0630 |
| --- | --- | --- | --- |
| 7 | September 25, 2018 | $10,000 | Wire transfer from Fifth Third Acct. No. X5997 to Chase Acct. No. X0630 |
| 8 | October 4, 2018 | $10,000 | Wire transfer from Fifth Third Acct. No. X5997 to Chase Acct. No. X0630 |
| 9 | October 10, 2018 | $10,000 | Wire transfer from Fifth Third Acct. No. X5997 to Chase Acct. No. X0630 |
| 10 | October 22, 2018 | $10,000 | Wire transfer from Fifth Third Acct. No. X5997 to Chase Acct. No. X0630 |
| 11 | October 30, 2018 | $15,000 | Wire transfer from Fifth Third Acct. No. X5997 to Chase Acct. No. X0630 |
| 12 | November 6, 2018 | $15,000 | Wire transfer from Fifth Third Acct. No. X5997 to Chase Acct. No. X0630 |
| 13 | November 13, 2018 | $20,000 | Wire transfer from Fifth Third Acct. No. X5997 to Chase Acct. No. X0630 |
| 14 | December 3, 2018 | $25,000 | Wire transfer from Fifth Third Acct. No. X5997 to Chase Acct. No. X0630 |
| 15 | December 11, 2018 | $15,000 | Wire transfer from Fifth Third Acct. No. X5997 to Chase Acct. No. X0630 |
| 16 | December 26, 2018 | $15,000 | Wire transfer from Fifth Third Acct. No. X5997 to Chase Acct. No. X0630 |
| 17 | January 18, 2019 | $5,000 | Cashier's Check No. 30857565 from Fifth Third Bank to Florida Primacy Sourcing |

| 18 | February 11, 2019 | $15,000 | Wire transfer from Fifth Third Acct. No. X5997 to Chase Acct. No. X0630 |
| 19 | February 20, 2019 | $10,000 | Wire transfer from Fifth Third Acct. No. X5997 to Chase Acct. No. X0630 |
| 20 | March 20, 2019 | $25,000 | Wire transfer from Fifth Third Acct. No. X5997 to Chase Acct. No. X0630 |
| 21 | April 4, 2019 | $5,000 | Wire transfer from Fifth Third Acct. No. X5997 to Chase Acct. No. X0630 |
| 22 | April 19, 2019 | $10,000 | Wire transfer from Fifth Third Acct. No. X5997 to Chase Acct. No. X0630 |
| 23 | May 15, 2019 | $34,000 | Wire transfer from Fifth Third Acct. No. X5997 to Chase Acct. No. X0630 |

In violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B), and Title 18, United States Code, Section 2.

## COUNT TWENTY-FOUR
### Money Laundering
### (18 U.S.C. § 1957)

58. The allegations set forth in paragraphs 1 through 57 are hereby repeated, realleged, and incorporated as if fully set forth herein.

59. On or about January 18, 2019, in the Eastern District of Tennessee, the defendant, IAN P. CLARKE, did knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000; that is, CLARKE transferred $15,000 of the fraudulently obtained proceeds to his personal savings account at Fifth Third Bank (Acct. No.

13

X9730), such proceeds having been derived from a specified unlawful activity; that is, health care fraud, in violation of Title 18, United States Code, Section 1349.

In violation of Title 18, United States Code, Sections 1957 and 2.

## COUNT TWENTY-FIVE
### Money Laundering
### (18 U.S.C. § 1957)

60. The allegations set forth in paragraphs 1 through 57 are hereby repeated, realleged, and incorporated as if fully set forth herein.

61. On or about April 4, 2019, in the Eastern District of Tennessee, the defendant, IAN P. CLARKE, did knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000; that is, CLARKE transferred $20,000 of the fraudulently obtained proceeds to his personal savings account at Fifth Third Bank (Acct. No. X9730), such proceeds having been derived from a specified unlawful activity; that is, health care fraud, in violation of Title 18, United States Code, Section 1349.

In violation of Title 18, United States Code, Sections 1957 and 2.

## COUNT TWENTY-SIX
### Money Laundering
### (18 U.S.C. § 1957)

62. The allegations set forth in paragraphs 1 through 57 are hereby repeated, realleged, and incorporated as if fully set forth herein.

63. On or about August 1, 2019, in the Eastern District of Tennessee, the defendant, IAN P. CLARKE, did knowingly engage and attempt to engage in a monetary transaction by, through, and to a financial institution, affecting interstate and foreign commerce, in criminally derived property of a value greater than $10,000; that is, CLARKE transferred $28,000 of the fraudulently obtained proceeds to his personal savings account at Fifth Third Bank (Acct. No.

14

X9730), such proceeds having been derived from a specified unlawful activity; that is, health care fraud, in violation of Title 18, United States Code, Section 1349.

In violation of Title 18, United States Code, Sections 1957 and 2.

## **FORFEITURE**

### **(18 U.S.C. § 982)**

1. The allegations contained in this Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of certain property in which the defendants have an interest.

2. Upon conviction of any violation as alleged in Counts 1 through 23 of this Indictment, the defendant so convicted shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(7), any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such violation.

3. Upon conviction of any violation as alleged in Counts 24 through 26 of this Indictment, the defendant so convicted shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offense, or any property traceable to such property.

4. The property subject to forfeiture, pursuant to Title 18, United States Code, Section 982(a)(7), in violation of Title 18, United States Code, Section 371 and Title 42, United States Code, Sections 1320a-7b(b)(2)(B) includes, but is not limited to, a money judgment in the amount of approximately $411,963, which constitutes the sum equal in value to the gross proceeds traceable to the commission of the health care violations the defendant personally obtained as alleged in this Indictment.

5. The property subject to forfeiture, pursuant to Title 18, United States Code, Section 982(a)(1), in violation of Title 18, United States Code, Section 1957 includes, but is not

15

limited to, a money judgment in the amount of approximately $63,000, which constitutes the sum equal in value to the proceeds traceable to the commission of the money-laundering offenses the defendant personally obtained as alleged in this Indictment.

6. If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with a third party;

    c. has been placed beyond the jurisdiction of the court;

    d. has been substantially diminished in value; or

    e. has been co-mingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

All pursuant to Title 18, United States Code, Sections 982(a)(1) and (7), and the procedures set forth in Title 21, United States Code, Section 853, made applicable by Title 18, United States Code Section 982(b)(1).

A TRUE BILL:

**SIGNATURE REDACTED**
_____
GRAND JURY FOREPERSON

Francis M. Hamilton III
Acting United States Attorney

By: _William A. Roach Jr._
William A. Roach, Jr.
Assistant United States Attorney

16