UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | No. 3:21-cr-77 |
| v. | ) | |
| | ) | Judge Crytzer |
| IAN P. CLARKE | ) | |

**PLEA AGREEMENT**

The United States of America, by the United States Attorney for the Eastern District of Tennessee, and the defendant, IAN P. CLARKE, and the defendant's attorney, Keith D. Stewart, have agreed upon the following:

1. Defendant will plead guilty to the following count in the indictment:

    (a) **Count One**, conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349.

    (b) The maximum punishment for that offense is 10 years' imprisonment, three years of supervised release, a fine of up to $250,000, restitution and forfeiture, if applicable; and a $100 mandatory special assessment.

2. In consideration of defendant's guilty plea, the United States agrees to move the Court at sentencing to dismiss the remaining counts in the indictment against defendant.

3. Defendant has read the indictment, discussed the charges and possible defenses with defense counsel, and understands all the crimes charged in the indictment. Specifically, the elements of **Count One** are as follows:

    (a) two or more persons conspired, or agreed, to commit health care fraud, as charged in the indictment.

    (b) defendant knowingly and voluntarily joined the conspiracy.

1

4. In support of defendant's guilty plea, defendant agrees and stipulates to the following facts, which satisfy the offense elements. These are the facts submitted for purposes of defendant's guilty plea. They do not necessarily constitute all the facts in the case. Other facts may be relevant to sentencing. Defendant and the United States retain the right to present additional facts to the Court to ensure a fair and appropriate sentence in this case.

(a) Medicare is a federally funded health care program that provides benefits to persons who are at least 65 years old or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services ("HHS"). Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries." Medicare is divided into multiple parts: Part A covers hospital inpatient care; Part B covers physicians' services and outpatient care, including an individual's access to durable medical equipment ("DME") like orthotic braces; Part C is Medicare Advantage Plans; and Part D covers prescription drugs.

(b) Physicians, clinics, and other health care providers, including DME companies, that provide services to Medicare beneficiaries may apply for and obtain a Medicare "provider number." A health care provider that receives a Medicare provider number may file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

(c) A Medicare claim must contain certain important information, including: (a) the Medicare beneficiary's name and Health Insurance Claim Number ("HICN"); (b) a description of the health care benefit, item, or service that was provided or supplied to the beneficiary; (c) the billing codes for the benefit, item, or service; (d) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (e) the name of the referring physician or other health care provider, as well as a unique identifying number, known

2

either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). The claim form is submitted in hard copy or electronically.

(d) Enrolled Medicare providers agree to abide by Medicare's policies and procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers are required to abide by all Medicare-related laws and regulations, including the Anti-Kickback Statute (42 U.S.C. § 1320a–7b(b)(2)), which proscribes the offering, payment, solicitation, or receipt of any remuneration to induce the referral of a patient or the purchase, lease, order, or arrangement therefor, of any good, facility, service, or item for which payment may be made by a federal health care program. Providers are given access to Medicare manuals and services bulletins describing billing procedures, rules, and regulations. Medicare only pays for services that are medically necessary and reasonable, and which are actually provided as represented. Medicare does not pay claims for beneficiaries, items, or services that were procured based on the payment or receipt of kickbacks and bribes.

(e) Medicare is a "Federal health care program" as defined in 42 U.S.C. § 1320a-7b(f), and a "health care benefit program" as defined in 18 U.S.C. § 24(b).

(f) Medicare Part B covers certain DME, such as Off-The-Shelf ("OTS") knee braces, back braces, shoulder braces, and wrist braces (collectively, "braces"). OTS braces require minimal self-adjustment for appropriate use and do not require expertise in trimming, bending, molding, assembling, or customizing to fit to the individual. A claim for DME submitted to Medicare qualifies for reimbursement only if it was medically necessary to the treatment of the beneficiary's illness or injury and prescribed by the beneficiary's physician.

3

(g) Vincent Harris ("Harris") Harris owned and operated Smart Support Professionals LLC ("Smart Support Professionals"), a North Dakota registered business entity doing business in Boca Raton, Florida, and other places.

(h) Earl Pratt ("Pratt") owned and operated Florida Primary Sourcing LLC ("Florida Primary Sourcing"), a Florida registered business entity doing business in Boca Raton, Florida, and other places.

(i) TN Premier Care LLC ("TN Premier Care") was a Tennessee registered business entity doing business in the Eastern District of Tennessee.

(j) Defendant IAN P. CLARKE was responsible for all day-to-day operations of TN Premier Care.

(k) Between in or about July 2018, and in or about May 2019, within the Eastern District of Tennessee and elsewhere, IAN P. CLARKE, Pratt, Harris, and others did knowingly and willfully conspire and agree to offer, pay, solicit, and receive kickbacks in exchange for signed doctors' orders that were used to support claims for DME that was medically unnecessary.

(l) The conspiracy operated as follows: (i) Harris, through his company Smart Support Professionals, acquired "leads," which were recorded calls between a call-center employee or telemarketer and a Medicare beneficiary in which the beneficiary provided his or her personal information, including name and Medicare beneficiary information; (ii) Harris then arranged for a licensed physician to sign an order for a brace based on the lead; (iii) Harris then uploaded the completed brace orders to a shared cloud-based document storage system—i.e., Box or Dropbox—to which IAN P. CLARKE, Harris, Pratt, and others had access; (iv) IAN P.

4

CLARKE, through TN Premier Care, then submitted, or caused the submission of, the completed brace orders to Medicare for reimbursement.

(m) IAN P. CLARKE, Pratt, Harris, and others agreed on an operating plan to accomplish the purpose of the conspiracy, which they implemented as follows: IAN P. CLARKE, through TN Premier Care, paid kickbacks to Pratt, through Florida Primary Sourcing, which Pratt transferred to Harris, through Smart Support Professionals. In return, Harris acquired completed brace orders, which he uploaded to a shared cloud-based document storage system to which IAN P. CLARKE, Pratt, Harris, and others had access. IAN P. CLARKE, through TN Premier Care, then submitted, or caused to be submitted, the completed brace orders to Medicare for reimbursement.

(n) The physicians who signed the brace orders that IAN P. CLARKE purchased from Harris, through Pratt, often did so regardless of medical necessity, in the absence of a pre-existing doctor-patient relationship, without a physical examination, and sometimes based solely on a short telephonic conversation.

(o) IAN P. CLARKE opened a separate bank account in TN Premier Care's name for the purpose of (i) receiving reimbursement checks and direct deposits from CMS for DME provided by TN Premier Care to Medicare beneficiaries across the country and (ii) for paying kickbacks to Pratt in return for completed brace orders.

(p) Using the separate bank account, IAN P. CLARKE caused TN Premier Care to pay kickbacks in the form of wire transfers to Pratt.

(q) Between in or about July 2018 and in or about May 2019, IAN P. CLARKE caused TN Premier Care to pay unlawful kickbacks in the amount of approximately $250,000 to Pratt for completed brace orders acquired by Harris.

5

(r) Between in or about July 2018 and in or about May 2019, IAN P. CLARKE caused TN Premier Care to submit approximately $778,429 in claims to Medicare for completed brace orders, for which TN Premier Care received approximately $411,963 from Medicare. Of the claims submitted to Medicare by TN Premier Care during that time, most of the claims, if not all the claims, were completed brace orders that IAN P. CLARKE purchased from Harris and Smart Support Professionals, through Pratt.

(s) To conceal the conspiracy, IAN P. CLARKE, Pratt, Harris, and others created sham contracts and documentation to disguise the kickbacks as legitimate payments for marketing and consulting services.

(t) For example, in or around April 2019, after federal agents conducted a national operation targeting fraud and kickbacks related to DME and other braces, which garnered national media coverage, IAN P. CLARKE emailed Pratt requesting that Florida Primary Sourcing execute a consulting services agreement ("Consulting Agreement") that falsely stated that Florida Primary Sourcing would be compensated by TN Premier Care for "developing future and current patient services and marketing . . . via telephone or other forms of remote correspondence" for TN Premier Care. The Consulting Agreement provided that TN Premier would compensate Florida Primary Sourcing on a monthly basis to "reflect[] the potential of ideas and opportunities employed." In fact, Florida Primary Sourcing did not provide any marketing or consulting services to TN Premier Care.

5. Defendant is pleading guilty because he is in fact guilty. Defendant understands that, by pleading guilty, he is giving up several rights, including:

(a) the right to plead not guilty;

(b) the right to a speedy and public trial by jury;

6

(c) the right to assistance of counsel at trial;

(d) the right to be presumed innocent and to have the burden of proof placed on the United States to prove the defendant guilty beyond a reasonable doubt;

(e) the right to confront and cross-examine witnesses against the defendant;

(f) the right to testify on one's own behalf, to present evidence in opposition to the charges, and to compel the attendance of witnesses; and

(g) the right not to testify and to have that choice not used against him.

6. The parties agree that the appropriate disposition of this case would be the following as to each count:

(a) The Court may impose any lawful term of imprisonment, any lawful fines, and any lawful terms of supervised release up to the statutory maximums.

(b) The Court will impose special assessment fees as required by law.

(c) The Court may order forfeiture as applicable and restitution as appropriate.

(d) Defendant agrees that the Court shall order restitution, pursuant to any applicable provision of law, for any loss caused to Medicare. Defendant agrees that under 18 U.S.C. §§ 3663(a)(3) and 3663A, the appropriate restitution amount, which represents the total amount of wrongful proceeds defendant received from his participation in the unlawful health care fraud conspiracy, is $411,963. The parties understand that the Court makes any determination regarding apportionment of restitution pursuant to 18 U.S.C. § 3664(h).

(e) Pursuant to Rule 11(c)(1)(B), at sentencing, the United States agrees to recommend that, pursuant to U.S.S.G. § 2B1.1(b)(1)(G), the total loss amount exceeded $250,000 but did not exceed $550,000. This recommendation is not binding on the Court, and in

7

the event the Court rejects this recommendation, defendant may not withdraw his guilty plea or rescind this plea agreement.

(f) Pursuant to Rule 11(c)(1)(B), at sentencing, the United States agrees to recommend that, pursuant to U.S.S.G. § 3B1.1, no aggravating role adjustment should apply. This recommendation is not binding on the Court, and in the event the Court rejects this recommendation, defendant may not withdraw his guilty plea or rescind this plea agreement.

7. No promises have been made by any representative of the United States to defendant as to what the sentence will be in this case. Any estimates or predictions made to defendant by defense counsel or any other person regarding any potential sentence in this case are not binding on the Court and may not be used as a basis to rescind this plea agreement or withdraw the defendant's guilty plea(s). Defendant understands that the sentence in this case will be determined by the Court after it receives the presentence investigation report from the United States Probation Office and any information presented by the parties. Defendant acknowledges that the sentencing determination will be based upon the entire scope of defendant's criminal conduct, his criminal history, and pursuant to other factors and guidelines as set forth in the Sentencing Guidelines and the factors set forth in 18 U.S.C. § 3553.

8. Given defendant's agreement to plead guilty, the United States will not oppose a two-level reduction for acceptance of responsibility under the provisions of § 3E1.1(a) of the Sentencing Guidelines. Further, if defendant's offense level is 16 or greater, and defendant is awarded the two-level reduction pursuant to § 3E1.1(a), the United States agrees to move the Court, at or before the time of sentencing, to decrease the offense level by one additional level pursuant to § 3E1.1 (b) of the Sentencing Guidelines. Should defendant engage in any conduct or make any statements that are inconsistent with accepting responsibility for his offense,

8

Case 3:21-cr-00077-KAC-JEM   Document 25   Filed 11/17/22   Page 8 of 12   PageID #: 131

including violations of conditions of release or the commission of any additional offense(s) prior to sentencing, the United States will be free to decline to make such motion, to withdraw that motion if already made, and to recommend to the Court that defendant not receive any reduction for acceptance of responsibility under § 3E1.1 of the Sentencing Guidelines.

9. Defendant agrees to pay the special assessment in this case prior to sentencing.

10. Financial Obligations. Defendant agrees to pay all fines and/or restitution imposed by the Court to the Clerk of Court. Defendant also agrees that the full fine and/or restitution amount(s) shall be considered due and payable immediately. If defendant cannot pay the full amount immediately and is placed in custody or under the supervision of the Probation Office at any time, defendant agrees that the Bureau of Prisons and the Probation Office will have the authority to establish payment schedules to ensure payment of the fine and/or restitution. Defendant further agrees to cooperate fully in efforts to collect any financial obligation imposed by the Court by set-off of federal payments, execution on non-exempt property, and any other means the United States deems appropriate. Defendant and counsel also agree that defendant may be contacted post-judgment regarding the collection of any financial obligation imposed by the Court without notifying defendant's counsel and outside the presence of defendant's counsel. In order to facilitate the collection of financial obligations to be imposed with this prosecution, defendant agrees to disclose fully all assets in which he has any interest or over which he exercises control, directly or indirectly, including those held by a spouse, nominee, or other third party. In furtherance of this agreement, defendant additionally agrees to the following specific terms and conditions:

(a) If requested by the United States, defendant will promptly submit a completed financial statement to the United States Attorney's Office, in a form it provides and as

9

Case 3:21-cr-00077-KAC-JEM Document 25 Filed 11/17/22 Page 9 of 12 PageID #: 132

it directs. Defendant promises that such financial statement and disclosures will be complete, accurate, and truthful.

(b) Defendant expressly authorizes the United States Attorney's Office to obtain a credit report on the defendant to evaluate defendant's ability to satisfy any financial obligation imposed by the Court.

(c) If requested by the United States, defendant will promptly execute authorizations on forms provided by the United States Attorney's Office to permit the United States Attorney's Office to obtain defendant's financial and tax records.

11. Defendant acknowledges that the principal benefits to the United States of this agreement include the conservation of limited government resources and bringing a certain end to the case. Accordingly, in consideration of the concessions made by the United States in this agreement and as a further demonstration of defendant's acceptance of responsibility for the offense committed, defendant voluntarily, knowingly, and intentionally agrees to the following:

(a) Defendant will not file a direct appeal of his conviction or sentence with one exception: defendant retains the right to appeal a sentence imposed above the sentencing guideline range determined by the Court or above any mandatory minimum sentence deemed applicable by the Court, whichever is greater. Defendant also waives the right to appeal the Court's determination as to whether his sentence will be consecutive or concurrent to any other sentence.

(b) Defendant will not file any motions or pleadings pursuant to 28 U.S.C. § 2255 or otherwise collaterally attack his conviction or sentence, with two exceptions: defendant retains the right to file a § 2255 motion as to (i) prosecutorial misconduct and (ii) ineffective assistance of counsel.

10

(c) Defendant will not, whether directly or by a representative, request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

12. This plea agreement becomes effective once it is signed by the parties and is not contingent on defendant's entry of a guilty plea. If the United States violates the terms of this agreement, defendant will have the right to withdraw from this agreement. If defendant violates the terms of this agreement in any way (including, without limitation, by failing to enter a guilty plea as agreed herein, moving to withdraw guilty plea after entry, or by violating any court order or any local, state, or federal law pending the resolution of this case), then the United States will have the right to void any or all parts of the agreement and may also enforce whatever parts of the agreement it chooses. In addition, the United States may prosecute defendant for any and all federal crimes that he committed related to this case, including any charges that were dismissed and any other charges the United States agreed not to pursue. Defendant expressly waives any statute-of-limitations defense and any constitutional or speedy trial or double jeopardy defense to prosecution for the conduct covered by this agreement. Defendant also understands and agrees that a violation of this agreement by defendant does not entitle him to withdraw his guilty plea.

13. The United States will file a supplement in this case, as required in every case by the Local Rules of the United States District Court for the Eastern District of Tennessee, even though there may or may not be any additional terms. If additional terms are included in the supplement, they are hereby fully incorporated herein.

11

14. This plea agreement and supplement constitute the full and complete agreement and understanding between the parties concerning defendant's guilty plea to the above-referenced charges. There are no other agreements, promises, undertakings, or understandings between defendant and the United States. The parties understand and agree that the terms of this agreement can be modified only in writing signed by all of the parties and that any and all other promises, representations, and statements whether made before, contemporaneous with, or after this agreement, are null and void.

**For the United States**

FRANCIS M. HAMILTON III
UNITED STATES ATTORNEY

11/17/2022
Date

By: *William A. Roach Jr.*
William A. Roach, Jr.
Assistant United States Attorney

**For the Defendant**

11/16/2022
Date

Ian P. Clarke
Defendant

11/16/2022
Date

Keith D. Stewart
Attorney for Defendant

12